(206 P.3d 1)
No. 98,966

MARK HEMPHILL and MONESSA HEMPHILL, *Appellants*, v. FORD MOTOR CO., FENTON MOTORS OF EL DORADO, and DAIMLERCHRYSLER SERVICES NORTH AMERICA, LLC, d/b/a CHRYSLER FINANCIAL, *Appellees*.

—

Opinion filed April 17, 2009.

*Barry Arbuckle*, of Wichita, for appellants.

*Creath L. Pollak*, of Minter & Pollak, of Wichita, for appellee DaimlerChrysler Services of North America, LLC.

*Darren E. Fulcher*, of Fulcher & Brooks, LLC, of Kansas City, Missouri, for appellees Ford Motor Company and Fenton Ford of El Dorado, Inc.

Before CAPLINGER, P.J., MALONE and LEBEN, JJ.

LEBEN, J.: Mark and Monessa Hemphill filed suit against Ford Motor Company, Fenton Motors (a Ford dealer), and Daimler-Chrysler Services North America, LLC (a car-financing entity doing business as "Chrysler Financial") for claims arising from the Hemphills' purchase of a Ford Mustang convertible. The purchase was financed through an agreement between the Hemphills, Fenton Motors, and Chrysler Financial, and the finance agreement contained an arbitration clause. When the Hemphills filed suit, all

three defendants moved to compel arbitration, and the district court granted that motion and stayed the suit pending arbitration.

The arbitrator issued an award granting some of the Hemphills' claims against Fenton Motors but also, in an amended award, granted Chrysler Financial's cross-claim against the Hemphills for a deficiency judgment on amounts still owed on the purchase. After the district court confirmed the arbitration award without objection, the Hemphills appealed, challenging the decision to compel arbitration and the arbitrator's authority to amend the arbitration award.

The Hemphills have appealed for different reasons as to each defendant:

- As to Fenton Motors, the Hemphills claim that because the initial purchase order didn't include an arbitration provision, Fenton Motors can't require arbitration based on an arbitration provision signed later in a financing document.
- As to Chrysler Financial, the Hemphills claim that the arbitrator had no authority to issue an amended award. Thus, because the arbitrator's initial award omitted the deficiency judgment for what the Hemphills still owed on the car, they contend that the arbitrator couldn't later amend the award to grant the deficiency judgment to Chrysler Financial.
- As to Ford Motor Company, the Hemphills claim that because Ford wasn't a signatory to the financing contract, it can't require arbitration.

We do not reach the merits of the Hemphills' appeal regarding Fenton Motors and Chrysler Financial. In both cases, the Hemphills have not preserved their appellate rights.

After arbitration, Fenton Motors paid the Hemphills the money awarded by the arbitrator, and the Hemphills cashed the check. Under the rule of acquiescence, a litigant who accepts the benefits of a judgment may not appeal that judgment. *Troyer v. Gilliland*, 247 Kan. 479, Syl., 799 P.2d 501 (1990). Having obtained the benefit of a money judgment against Fenton Motors, the Hemphills may not appeal that same judgment in the hope of obtaining

greater damages on the same claims that led to the arbitrator's award.

The Hemphills waived any right to appeal the arbitrator's authority to amend the award in favor of Chrysler Financial: they didn't raise the issue in the district court and didn't object to a motion to confirm the award. An arbitration award may be challenged at confirmation on the basis that the arbitrator exceeded his or her authority, see K.S.A. 5-412(a)(3); 9 U.S.C. § 10(a)(4) (2006), so the issue could have—and should have—been raised first before the district court. But an issue not raised before the district court may not be raised on appeal. *Miller v. Bartle,* 283 Kan. 108, 119, 150 P.3d 1282 (2007).

We are left, then, only with the Hemphills' appeal regarding Ford Motor Company. At issue is whether Ford, which wasn't a party to the contract containing the arbitration agreement, may nonetheless compel arbitration of the Hemphills' claims against it. We don't find that the Hemphills have acquiesced in the judgment in favor of Ford; the Hemphills didn't recover a money judgment against Ford, and their acceptance of payment from Fenton Motors doesn't logically relate to whether the Hemphills' claims against Ford are subject to arbitration. But because the Hemphills' claims against Ford were inextricably intertwined with their substantive claims against Fenton Motors and Chrysler Financial, the parties to the arbitration agreement, we conclude that the Hemphills were estopped from avoiding arbitration with Ford.

Even though it appears that this appeal has been greatly simplified, since we reach the merits only of the Hemphills' appeal regarding Ford, most of the issues the parties have briefed and argued retain significance on whether Ford had a right to compel arbitration of the Hemphills' claims against it. That's because any right Ford had to compel arbitration was a derivative one based on the rights of Fenton Motors and Chrysler Financial to compel arbitration, which were gained through a written contract Ford was not a party to. So, in determining whether Ford had the right to compel arbitration, we first must assure ourselves that Fenton Motors or Chrysler Financial or both had that right as well. If so, then we must assure ourselves that the claims against Ford were suffi-

ciently intertwined with those that the Hemphills agreed to arbitrate that the Hemphills should be required to pursue the claims against Ford in the same arbitration proceeding.

*Factual Background*

Before we get to the specific legal claims, let's review the key facts and contracts that will feature prominently in our analysis.

The Hemphills bought a 2004 Ford Mustang convertible from Fenton Motors. The first document they signed was a Retail Order for a Motor Vehicle, under which they agreed to buy the convertible. They paid $3,000 in cash and planned to finance the rest of the purchase price. The Hemphills took possession of the car the same day they signed the purchase order, and a request for financing was pending at that time with Ford Motor Credit. Fenton Motors told the Hemphills the next day that Ford Motor Credit turned them down for financing, and Chrysler Financial then approved financing.

Fenton Motors prepared a financing contract that was to be assigned to Chrysler Financial, and the Hemphills signed it. That financing contract was between the Hemphills, as buyers, and Fenton Motors, as creditor. By signing the agreement, the Hemphills chose to purchase the car on credit rather than for cash. The agreement contained an arbitration clause that allowed the Hemphills, Fenton Motors, or Chrysler Financial (as an assignee of Fenton Motors) to request arbitration to settle any dispute between them that related to the credit application, the financing contract, or the resulting transaction:

"Any claim or dispute, whether in contract, tort or otherwise (including any dispute over the interpretation, scope, or validity of this contract, the arbitration clause or the arbitrability of any issue), between us or Creditor's employees, agents, successors or assigns, which arise out of or relate to a credit application, this contract, or any resulting transaction or relationship (including any such relationship with third parties who do not sign this contract) shall, at the election of either of us (or the election of any such third party), be resolved by a neutral, binding arbitration and not by a court action."

The Hemphills claim that the car's convertible top leaked since shortly after they bought it and that several attempts to fix it were

unsuccessful. After those repair attempts, the Hemphills sent notice that they were revoking acceptance of the car to Fenton Motors and Ford; they also told Chrysler Financial that no more payments would be made, which led Chrysler Financial to repossess the car.

The Hemphills filed suit against Fenton Motors, Ford, and Chrysler Financial. The defendants moved to compel the Hemphills to arbitrate the claims, and the district court granted that motion over the Hemphills' objection. The arbitrator granted an award in favor of the Hemphills against Fenton Motors for damages of $1,133.68 plus interest, a civil penalty of $1,500, and attorney fees of $3,000. In an amended award, the arbitrator granted a deficiency judgment in favor of Chrysler Financial against the Hemphills for $11,091.15 still owed on the car. The arbitrator denied the Hemphills' claims against Ford. The district court confirmed the arbitration award in an agreed order; no party objected to the confirmation of the award. The Hemphills then filed this appeal.

I. *The Hemphills' Acceptance of Payment from Fenton Motors Does Not Constitute Acquiescence in the Judgment in Favor of Ford.*

Ford argued in its joint brief with Fenton Motors that the Hemphills acquiesced in the judgment so they were barred from appealing the district court's decision that Ford could compel arbitration. Ford suggests that the Hemphills "accept[ed] full satisfaction of the judgment in their favor," but Ford overlooks the lack of any judgment in favor of the Hemphills against Ford. The Hemphills recovered *only* against Fenton Motors. Against Ford, the Hemphills lost on the choice of forum when the district court overruled their objection to arbitration; they then lost in arbitration on the merits of all claims against Ford.

The question, then, is this: when the Hemphills accepted Fenton Motors' payment for the judgment against it, did the Hemphills somehow also acquiesce to the separate judgment in favor of Ford? We think not.

A party's acceptance of payment on a judgment generally constitutes acquiescence and thus eliminates the right of appeal. But this general rule has exceptions even when partial payment is ac-

cepted from the party against which judgment was entered: "[S]o long as the issues on appeal cannot affect the payments made or burdens assumed and such payment or burden is not involved in the issues on appeal," there is no acquiescence. *Brown v. Combined Ins. Co. of America*, 226 Kan. 223, Syl. ¶¶ 6-8, 597 P.2d 1080 (1979). Thus, when an insurance company made payment of some, but not all, of the disability payments it had been ordered to pay while an appeal was pending, there was no acquiescence because the insurance company did not dispute the policyholder's right to them. 226 Kan. at 231-32.

In our case, the Hemphills not only didn't accept a payment on a judgment against Ford (because there was no judgment against Ford), but also the payment they did accept from Fenton Motors had nothing to do with the issues they have appealed regarding Ford. The Hemphills' sole basis for appeal against Ford is their contention that their claims against Ford weren't subject to arbitration. The success or failure of that appeal cannot impact the judgment against Fenton Motors on which payment was accepted. If the Hemphills win their appeal against Ford, a lawsuit would proceed between the Hemphills and Ford. The Hemphills may only collect their damages once, so they may be entitled to a credit for damages already recovered against some other party, but the claim itself isn't impacted by the mere existence of some credit against damages. On the other hand, if the Hemphills lose their appeal against Ford, their acceptance of payment from Fenton Motors still has no impact. The Hemphills received no recovery against Ford in arbitration, so the payment was not related to Ford under the existing judgment.

The situation is quite different with respect to Fenton Motors, where we have ruled the Hemphills have lost their appellate rights through acquiescence. If the Hemphills were to win their appeal against Fenton Motors, the arbitration award would be set aside, and the parties would start over toward resolving the merits in litigation. With the arbitration award set aside, there would be no *uncontested* amount that the Hemphills could accept without acquiescence. That is different from *Brown*, where there was no ac-

quiescence where the insurance company did not contest the benefits that were paid and accepted while the appeal was pending.

The doctrine of acquiescence is based on the inconsistency between accepting some benefit or burden from a judgment while appealing the judgment itself. *Brown*, 226 Kan. 223, Syl. ¶ 6. Thus, it's inconsistent to accept partial payment on a judgment when a party might later have to pay all or part of it back. But there's no risk of that here with respect to the Hemphills' appeal against Ford. Whether the Hemphills win or lose against Ford, the Hemphills could not be required to pay back to Fenton Motors money that it had paid to them. The Hemphills have not acquiesced in any judgment against Ford, and they are not barred by the doctrine of acquiescence from pursuing an appeal of the district court's decision to require arbitration of their claims against Ford.

II. *Fenton Motors and Chrysler Financial Both Had the Right to Compel Arbitration of the Claims Against Them.*

We turn then to whether Fenton Motors and Chrysler Financial had the right to compel arbitration of the Hemphills' claims against them. If not, then Ford could have no derivative right to compel arbitration.

Chrysler Financial's right to compel arbitration is straightforward. The Hemphills had no relationship with Chrysler Financial except for the financing of this car purchase. The credit arrangements for that transaction were made by contract between the Hemphills as buyers and Fenton Motors as creditor, and Fenton Motors then assigned the contract to Chrysler Financial. That contract expressly allowed for arbitration of any claim or dispute "between us," *i.e.*, the Hemphills and Fenton Motors, *or* "Creditor's . . . assigns," *i.e.*, Chrysler Financial, so long as the dispute related to the financing contract "or any resulting transaction or relationship."

The Hemphills bought the car through Chrysler Financial's extension of credit, and the Hemphills had no relationship with Chrysler Financial other than the credit agreement. Their claims against Chrysler Financial necessarily arise out of and relate to that

contract. Thus, Chrysler Financial had a right to compel arbitration of the claims against it.

Fenton Motors was a party to that same financing agreement, which contained the arbitration provision. But the Hemphills argue that they had already agreed to buy the car through the Retail Order for a Motor Vehicle, which didn't include an arbitration agreement. Based on that, the Hemphills contend that Fenton Motors gave them no new consideration in exchange for the arbitration provision in the later agreement, so it shouldn't be binding on them.

The arbitration clause in the financing agreement said that the transaction was one in interstate commerce and that the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* (2006), would govern. Because Kansas procedural law generally governs where it doesn't conflict with federal substantive law, Kansas courts have looked to both state and federal arbitration laws in resolving cases with arbitration issues. See *MBNA America Bank v. Credit*, 281 Kan. 655, 657, 132 P.3d 898 (2006). Neither party has suggested any substantive difference between federal and state arbitration statutes that might impact the issues in this case.

Federal cases have dealt with the question of when an arbitration agreement in only one of two related contracts may be applied to disputes arising under the contract that had no arbitration provision in it. When an arbitration agreement is broadly written, providing that any claim that "relates to" the underlying contract is subject to arbitration, then other agreements between the same parties that don't themselves contain an arbitration agreement may well be subject to arbitration too. In addition, when a third party is involved in claims arising under the agreement with no arbitration provision—but the claims arising out of that agreement are intertwined with ones involving parties who signed the related agreement agreeing to arbitration—the third party may compel arbitration of the intertwined disputes. See *Sourcing Unlimited, Inc. v. Asimco Intern., Inc.*, 526 F.3d 38, 46-47 (1st Cir. 2008) (signatory to arbitration agreement may be compelled to arbitrate claim against nonsignatory when that claim is intertwined with the agreement containing the arbitration provision); *JLM Industries, Inc. v.*

*Stolt-Nielsen SA*, 387 F.3d 163, 177-78 (2d Cir. 2004) (same); *Ford Motor Co. v. Ables*, 207 Fed. Appx. 443, 448 (5th Cir. 2006) (same). By the enactment of the Federal Arbitration Act, Congress established a strong national policy favoring arbitration of claims. *Vaden v. Discover Bank*, 556 U.S. 49, 173 L. Ed. 2d 206, 129 S. Ct. 1262, 1271 (2009). Kansas has also recognized a strong public policy in enforcing arbitration agreements, such that courts generally seek to uphold arbitration agreements even in the face of some uncertainty. *City of Andover v. Southwestern Bell Telephone*, 37 Kan. App. 2d 358, 361, 153 P.3d 561 (2007). Thus, it is not surprising that a broadly written arbitration provision covering any claims "related to" the underlying contract may bring within its scope disputes that arise out of a separate agreement. See *Skewes v. Shearson Lehman Bros.*, 250 Kan. 574, Syl. ¶ 3, 829 P.2d 874 (1992) (under Federal Arbitration Act, any doubts about whether arbitration is required should be resolved in favor of arbitration).

Synthesizing the federal caselaw, the Kansas federal court recently outlined a set of factors to consider in determining whether to compel arbitration of a dispute arising under an agreement that has no arbitration clause when a related contract contains a broad provision to compel arbitration: "(1) whether the agreements incorporate or reference each other; (2) whether the agreements are dependent on each other or relate to the same subject matter; (3) whether the arbitration clause specifically excludes certain claims; (4) whether the agreements are executed closely in time and by the same parties. [Citations omitted.]" *Consolidated Brokers Ins. v. Pan-American Assur.*, 427 F. Supp. 2d 1074, 1082 (D. Kan. 2006).

The Hemphills' argument that Fenton Motors can't compel arbitration of their disputes discounts the obvious relationship between the initial purchase agreement and the financing agreement. The purchase agreement contemplated a credit purchase: the Hemphills paid $3,000 in cash and had an unpaid balance "due on delivery" of $23,982.34. In addition, the purchase agreement called for them to "execute such other forms of agreement or documents as may be required by the terms and conditions of payment." Of course, the Hemphills could have arranged financing on their own

with some entity that did not require arbitration, but they soon entered into the credit agreement with Fenton Motors, which it assigned to Chrysler Financial—a credit agreement that included the arbitration provision.

Under the factors set out in *Consolidated Brokers Insurance Services*, (1) the agreements at issue here do reference one another; (2) they relate to the same subject matter, purchase of the car; (3) no disputes are explicitly excluded from arbitration; and (4) the same parties entered the agreements within a close time period. We conclude that the purchase contract and the financing contract were sufficiently related that Fenton Motors, a party to both agreements, could compel arbitration regarding a dispute arising out of either agreement. See *Ables*, 207 Fed. Appx. at 449 (finding that tort and contract claims against manufacturer were subject to arbitration under financing agreement, not signed by manufacturer, used to finance car purchase when claims were intertwined); *Smith v. Mark Dodge, Inc.*, 934 So. 2d 375, 380-81 (Ala. 2006) (finding that contract and warranty claims against manufacturer were subject to arbitration under an arbitration agreement with the dealer when claims against both were intertwined).

III. *Because the Claims Against Fenton Motors and Chrysler Financial Were Closely Intertwined with Those Against Ford, the Hemphills Could Not Stop Ford from Having the Claims Against It Resolved Along with the Claims Against the Other Defendants.*

Ford was not a party to the financing agreement, which contained the arbitration provision. Nor was Ford explicitly covered there. The parties listed in the arbitration provision were the Hemphills and Fenton ("us") or one of the "Creditor's" (Fenton Motors) "employees, agents, successors or assigns." Chrysler Financial was the assignee of Fenton Motors, but Ford wasn't.

Ford argues that it is covered by the language referencing "third parties who do not sign this contract." The arbitration agreement provides two explicit requirements for its application:

- the dispute must be "between" the Hemphills and either Fenton Motors or one of its assigns or agents; and

- the dispute must "arise out of or relate to a credit application, this contract, or any resulting transaction or relationship (including any such relationship with third parties who do not sign this contract)."

Ford has skipped over the first of these two separate requirements. Ford does not claim that it was an agent or assignee of Fenton Motors, and it certainly was not an agent or assignee of Fenton Motors with respect to Fenton Motors' role as their *creditor*: Ford played no role in financing the purchase. Thus, the Hemphills did not agree to arbitrate claims against Ford by entering into the financing agreement.

But that's not the end of the matter. Even when an arbitration provision doesn't provide that a third party may compel arbitration of disputes, that may still be the net result if the dispute with the third party is closely connected to disputes that the provision explicitly covers. Courts have reached this result based on an estoppel theory. Under that theory, the Hemphills might be estopped, or precluded, from opposing arbitration of their disputes with Ford if those disputes are closely connected to the disputes with Fenton Motors and Chrysler Financial, since the Hemphills did agree to arbitration of those matters.

There is substantial legal support for the estoppel theory Ford presents. Indeed, at least seven federal circuits have recognized that a nonsignatory to the arbitration agreement may compel a party that signed the arbitration provision to arbitrate a claim that is closely intertwined with ones covered by the arbitration provision. See *Sourcing Unlimited, Inc. v. Asimco Intern., Inc.*, 526 F.3d 38 (1st Cir. 2008); *Denney v. BDO Seidman, L.L.P.*, 412 F.3d 58, 70 (2d Cir. 2005); *E.I. DuPont de Nemours v. Rhone Poulenc Fiber*, 269 F.3d 187, 199-02 (3d Cir. 2001); *Long v. Silver*, 248 F.3d 309, 320 (4th Cir. 2001); *Grigson v. Creative Artists Agency*, 210 F.3d 524, 527-28 (5th Cir. 2000); *CD Partners, LLC v. Grizzle*, 424 F.3d 795, 798 (8th Cir. 2005); *MS Dealer Service Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999). Although the test may be stated in varied terms in these cases, it boils down to how close a connection exists between the claims explicitly subject to arbitration and those

involving the party that didn't sign the arbitration agreement. The Eleventh Circuit's phrasing is typical: Equitable estoppel should be applied " 'when the signatory [to the contract containing the arbitration clause] raises allegations of . . . substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.' " *MS Dealer Service Corp.*, 177 F.3d at 947.

The Hemphills' claims against Ford are so closely connected to their claims against Fenton Motors and Chrysler Financial that the Hemphills are estopped from refusing Ford's attempt to compel arbitration. The Hemphills set out nine counts in their amended complaint. A review of the allegations shows the substantially connected nature of the claims against Ford with claims made against Fenton Motors or Chrysler Financial:

- Counts 1 and 2 alleged breach of express and implied warranties against both Ford and Fenton Motors. The Hemphills said they made demand on both Ford and Fenton Motors to repair the vehicle and notified both that they were revoking acceptance of the car after it hadn't been repaired. The Hemphills also sought the same relief against both.

- Count 3 alleges Ford's violation of the Kansas lemon law, K.S.A. 50-645. Count 5 alleges Ford's violation of the Kansas Consumer Protection Act, K.S.A. 50-623 *et seq*. The Hemphills allege that Ford said it would make needed repairs but didn't do so. Their allegations specifically bring the dealer into play, alleging that Ford "represented, through its repair agent, that the convertible roof system was fully repaired . . . when in fact, it was not." Count 3 specifically sought cancellation of the purchase contract, but that contract was with Fenton Motors, not Ford.

- Count 4 alleges Ford's violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq*. The Hemphills again allege that Ford, "through its dealer repair agents," failed to make repairs. In addition, the Hemphills allege that *both* Ford *and* Fenton Motors were suppliers under the Magnuson-Moss Act.

- Count 6 alleges that Fenton Motors violated the Kansas Consumer Protection Act by engaging in deceptive acts or practices, including refusing the Hemphills' revocation of acceptance. As previously noted, the Hemphills alleged in Count 1 that they demanded to revoke acceptance on both Ford and Fenton Motors; also in Count 1, the Hemphills sought court-ordered revocation of acceptance "from the manufacturer and dealer."

- Counts 7, 8, and 9 set out claims against Chrysler Financial. In Count 7, the Hemphills alleged that Chrysler Financial converted their car by repossessing it despite notice of the Hemphills' revocation of acceptance to Ford and Fenton Motors. In Count 8, the Hemphills asserted that Chrysler Financial violated the Uniform Commercial Code when Chrysler Financial refused to release its security interest in the car. In Count 9, the Hemphills asserted that Chrysler Financial violated the Kansas Consumer Protection Act based on its failure to recognize the Hemphills' superior rights to the car. The Hemphills' claims on all three counts rested on their assertion that Chrysler's security interest in the car was subject to all of the Hemphills' "claims and defenses" against Fenton Motors and Ford.

In sum, the Hemphills claimed that the car made by Ford leaked from the start, and that Ford, with the help of its dealer Fenton Motors, didn't fix it. The Hemphills claimed the same right to revoke acceptance of the car against both Ford and Fenton Motors. And the Hemphills' claims against Chrysler Financial were all based on the theory that Chrysler Financial's interests were subordinate to the Hemphills' claims and defenses against Ford and Fenton Motors. Because the Hemphills agreed to arbitrate their claims against Fenton Motors and Chrysler Financial, it makes sense to require that the closely connected claims against Ford be arbitrated too. It would be senseless to have parallel arbitration and court proceedings both devoted to determining whether and why the car leaked, whether the car could be fixed, and what was said by whom and to whom throughout the parties' dealings.

## IV. *The Magnuson-Moss Warranty Act Does Not Prohibit Arbitration of Claims Arising Under That Statute.*

The Hemphills have one final argument against Ford's right to compel arbitration. The Hemphills included a claim under the Magnuson-Moss Warranty Act, and they argue that claims under that statute are not subject to arbitration. While there is some legal support for the Hemphills on this point, we conclude that the statutory language cannot be read to preclude arbitration given the underlying federal policy in favor of arbitration agreements.

Let's start with the statutory language. The Hemphills claim that 15 U.S.C. section 2310(a)(3)(C)(2006), a section authorizing informal dispute-settlement procedures, prohibits arbitration of Magnuson-Moss Act claims, but nothing in that provision even *mentions* arbitration:

"(3) One or more warrantors may establish an informal dispute settlement procedure which meets the requirements of the Commission's rules under paragraph (2). If—

"(A) a warrantor establishes such a procedure,

"(B) such procedure, and its implementation, meets the requirements of such rules, and

"(C) he incorporates in a written warranty a requirement that the consumer resort to such procedure before pursuing any legal remedy under this section respecting such warranty,

"then (i) the consumer may not commence a civil action (other than a class action) under subsection (d) of this section unless he initially resorts to such procedure; and (ii) a class of consumers may not proceed in a class action under subsection (d) of this section except to the extent the court determines necessary to establish the representative capacity of the named plaintiffs, unless the named plaintiffs (upon notifying the defendant that they are named plaintiffs in a class action with respect to a warranty obligation) initially resort to such procedure."

Under the explicit terms of the statute, if a company providing a warranty has set up an informal dispute-settlement procedure meeting Federal Trade Commission rules, then a consumer may not bring suit under the Act until first trying the informal route.

The FTC was given authority to develop the minimum requirements for informal dispute-settlement procedures, and it determined by rule that decisions made through the informal dispute-settlement process "shall not be legally binding on any person." 16

C.F.R. 703.5(j). In comments, the FTC suggested that Congress had "made clear" that it wanted dispute-resolution procedures "to not be binding." 40 Fed. Reg. 60168, 60210 (1975) (*quoted in Wilson v. Waverlee Homes, Inc.*, 954 F. Supp. 1530, 1539 [M.D. Ala. 1997]).

The FTC's interpretation of the Magnuson-Moss Warranty Act came at a time when courts and agencies placed greater weight on the clues to congressional intent that might be found in legislative history even when those clues found no support in the statutory language. See Eskridge, Frickey & Garrett, Cases and Materials on Legislation: Statutes and the Creation of Public Policy, pp. 987-91 (4th ed. 2007). More importantly, the FTC's interpretation came before the United States Supreme Court's decision in *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 96 L. Ed. 2d 185, 107 S. Ct. 2332 (1987), which set out the standards under which courts should determine whether Congress has intended to carve out an exception to the general federal policy favoring arbitration.

In *Shearson/American Express*, the Court first noted the strong federal policy favoring arbitration and the extensive reach of the Federal Arbitration Act. 482 U.S. at 225-26. Given a statute directly and strongly favoring arbitration, the Court held that a party opposing arbitration "must demonstrate that Congress intended to make an exception to the Arbitration Act for claims arising under [a statute], an intention discernible from the text, history, or purposes of the statute." 482 U.S. at 227.

Under *Shearson/American Express*, then, we start with the text of the statute. As we've already noted, nothing in the text prohibits arbitration. The text does show that Congress intended to provide an avenue in warranty agreements for informal dispute-resolution procedures, like mediation or nonbinding arbitration, but the inclusion of a provision allowing nonbinding arbitration can't be read as a sweeping exclusion of binding arbitration.

We turn next to legislative history. Two federal appellate courts have carefully reviewed the legislative history after *Shearson/American Express*, and neither of them found an intention to preclude, or even to address, binding arbitration. *Walton v. Rose Mobile*

*Homes LLC*, 298 F.3d 470, 479 (5th Cir. 2002); *Davis v. Southern Energy Homes, Inc.*, 305 F.3d 1268, 1271-72 (11th Cir. 2002). But see *Koons Ford v. Lobach*, 398 Md. 38, 51-63, 919 A.2d 722 (2007) (concluding that because binding arbitration wasn't generally considered a substitute for litigation when the Magnuson-Moss Warranty Act passed, the legislative history should be read as an indication that Congress intended to protect consumers from forced resolution of claims through binding arbitration). We agree that, as the courts concluded in *Walton* and *Davis*, the legislative history at most shows a congressional intent that any *informal* dispute-resolution process provided by the warrantor should be nonbinding and that this doesn't show an intent to preclude more formal, binding arbitration.

We must also consider whether there is any inherent conflict between arbitration and the underlying purposes of the Magnuson-Moss Warranty Act. The statute provides that the Act is "to improve the adequacy of information available to consumers, prevent deception, and improve competition in the marketing of consumer products." 15 U.S.C. § 2302(a) (2006). In general, the Act was intended to protect consumers. In light of the overall federal policy favoring arbitration of disputes, we do not see how neutral and fair arbitration procedures would necessarily conflict with that purpose. Indeed, fair arbitration proceedings may provide consumers with a more cost-effective and timely enforcement of warranty provisions. Congress could certainly choose to prohibit arbitration regarding these claims, but there is nothing inherently inconsistent between the purposes of the Magnuson-Moss Warranty Act and binding arbitration.

One test beyond that of *Shearson/American Express* should also be noted. Under *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 842-43, 81 L. Ed. 2d 694, 104 S. Ct. 2778 (1984), courts generally should defer to a federal agency's interpretation of a statute unless Congress has specifically and unambiguously spoken on the subject or the agency's interpretation is not based on a permissible interpretation of the statute. The federal appellate courts that have applied the *Chevron* test to the FTC's interpretation of this statute have refused to give *Chevron* deference to it, either

concluding that the FTC's interpretation was unreasonable, *Davis*, 305 F.3d at 1279-80, or that the unambiguous intent of Congress to favor arbitration under the Federal Arbitration Act controls. *Walton*, 298 F.3d at 475, 478. Once again, we agree with the conclusions of *Davis* and *Walton*.

The Hemphills do not discuss the *Shearson/American Express* analysis. They simply argue that "all the federal decisions, and the majority of state courts ruling on the issue, have held that the Magnuson-Moss [Warranty] Act prohibits binding arbitration." They are wrong about the federal decisions, as the *Davis* and *Walton* decisions demonstrate. They are correct, however, that there is caselaw in support of their overall conclusion. Several federal district courts and some state supreme courts have held that binding arbitration is prohibited under the statute. See, *e.g.*, *Browne v. Kline Tysons Imports, Inc.*, 190 F. Supp. 2d 827, 830-31 (E.D. Va. 2002); *Koons Ford v. Lobach*, 398 Md. 38, 51-64, 919 A.2d 722 (2007); *Parkerson v. Smith*, 817 So. 2d 529, 532-35 (Miss. 2002); *Simpson v. MSA of Myrtle Beach, Inc.*, 373 S.C. 14, 32-33, 644 S.E.2d 663, *cert. denied* 552 U.S. 990 (2007); *Breniser v. Western Recreational Vehicles, Inc.*, 2008 WL 5234528, at *5-6 (D. Ore. 2008) (unpublished opinion). But *Davis* and *Walton* are the only federal appellate decisions we've found that have considered *Shearson/American Express* standards on this question, and both the Fifth Circuit and the Eleventh Circuit concluded that the Magnuson-Moss Warranty Act doesn't preclude binding arbitration. Four state supreme courts have agreed with them. See *Southern Energy Homes, Inc. v. Ard*, 772 So. 2d 1131, 1135 (Ala. 2000); *Borowiec v. Gateway 2000, Inc.*, 209 Ill. 2d 376, 397-98, 808 N.E.2d 957 (2004); *Abela v. General Motors Corp.*, 469 Mich. 603, 607, 677 N.W.2d 325, *cert. denied* 543 U.S. 870 (2004); *In re American Homestar of Lancaster, Inc.*, 50 S.W.3d 480, 486-92 (Tex. 2001). In our view, the cases concluding that the Act doesn't preclude binding arbitration are more persuasive.

We close our discussion of this issue with one final observation based on the facts of our case. The provision requiring the Hemphills to arbitrate their claims against Ford does *not* come out of a warranty provision issued by Ford. Nor does it come out of any

informal dispute-resolution mechanism Ford has set up to deal with warranty claims. The arbitration provision in this case comes instead from a separate agreement in which the Hemphills agreed to arbitrate claims related to their financing agreement. In this context, the already weak argument that the Magnuson-Moss Warranty Act forbids provisions that require binding arbitration as part of an informal warranty-claims process has even less force. We conclude that the Magnuson-Moss Warranty Act does not prevent enforcement by Ford of the arbitration clause the Hemphills agreed to.

The judgment of the district court is affirmed.