(287 P.3d 287)

No. 105,147

ROBERT UHLMANN, *et al.*, *Appellees/Cross-appellants*, v.
JAY L. RICHARDSON, *et al.*, *Appellants/Cross-appellees*.

Opinion filed
August 3, 2012.

*Paul Hasty, Jr.*, and *Kathryn M. O'Shea*, of Hasty & Associates, LLC, of
Overland Park, for appellants/cross-appellees.

*Douglas D. Silvius, Frederick H. Riesmeyer, II,* and *Matthew P. Clune,* of Spradley & Riesmeyer, A Professional Corporation, of Kansas City, Missouri, for appellees/cross-appellants.

Before LEBEN, P.J., STANDRIDGE and ARNOLD-BURGER, JJ.

LEBEN, J.: Robert Uhlmann guaranteed the debt of a failed business. A jury decided that Jay and Cynthia Richardson did too, though they had denied having done so. When the business failed, Uhlmann paid the remaining business debt and then sued the Richardsons for their share under two legal theories, contribution and unjust enrichment. The trial judge submitted the unjust-enrichment claim to a jury, and the jury ruled in Uhlmann's favor.

The Richardsons have appealed, claiming that the unjust-enrichment claim shouldn't have been submitted to a jury at all. We agree with them that only the more closely confined contribution claim fit the facts of this case. Under contribution rules long recognized in Kansas, each coguarantor must pay his or her proportionate share of the guaranteed indebtedness—not the much more uncertain measure of damages normally applied in unjust-enrichment cases.

The Richardsons' victory on this issue may be in name only, however, because Uhlmann cross-appealed to preserve his contribution claim in case we held that unjust enrichment didn't apply. Because the jury determined that the Richardsons did sign the guarantee of the business debt, the Richardsons are responsible— subject to one caveat—for their proportionate share of the debt they had guaranteed. And that amount is slightly greater than the jury award.

The caveat is that Uhlmann's contribution claim is a claim in equity, and the Richardsons claimed equitable defenses—defenses that could limit or eliminate Uhlmann's recovery. The district court made no factual findings regarding those defenses, so we must remand the case to the district court for its determination on whether any equitable defense affects the Richardsons' liability for contribution.

We also address one other issue on this appeal: The Richardsons contend that Uhlmann lost the ability to pursue his cross-appeal

because Uhlmann first attempted to use court procedures to collect the judgment he had obtained against the Richardsons in the district court. But Uhlmann didn't collect anything on the judgment; he merely filed a garnishment so as to force the Richardsons to file an appeal bond, staying collection efforts on appeal. A judgment creditor does not forfeit the right to appeal merely by engaging in collection efforts that collect no money, and we find that Uhlmann did not lose the ability to pursue his cross-appeal.

## Factual Background

Michael Russell started and managed a self-storage business in Dallas, a business that he got off the ground by borrowing $2.67 million in August 2004 from Great Southern Bank. The business was formed as a limited-liability company called Walton Walker U-Stor, LLC (Walker U-Stor). Loan documents from Great Southern Bank included several guarantors: Russell and his wife, Carol; Robert Uhlmann (personally and through a revocable trust); and Jay and Cynthia Richardson (personally and through their revocable trusts).

According to the documents, the Russells gave a written guarantee for $427,200, or 16% of the total loan. Uhlmann's guarantee covered 60% of the loan, just over $1.6 million. And the Richardsons guaranteed 24%, or $640,800.

The Richardsons denied having signed any guarantees. But at trial, the jury was separately asked to determine that question, and the jury found that both of the Richardsons signed the guarantee agreements.

Even so, outside of the guarantees, the Richardsons clearly had a different relationship with Russell and with the business than Uhlmann did. Uhlmann and Russell had a long-standing friendship and had worked together on past business ventures, and Uhlmann was a part owner of Walker U-Stor. No formal agreement gave the Richardsons either an ownership interest or any other right to share in business profits.

Whether the Richardsons would have shared in business profits was never tested in practice. When Russell died in February 2009, the business was losing money, and the bank attempted to foreclose

the loan. Uhlmann took over effective ownership and control of the business when Russell died; with the help of Carol Russell, Uhlmann sold Walker U-Stor's property for $2 million. Uhlmann agreed not to seek any payment from Carol Russell on her guarantee. After turning proceeds of the property sale over to the bank, a deficiency of $962,547.46 remained, and Uhlmann paid it. He then brought suit against the Richardsons for their share.

Two other sums were part of Uhlmann's claims in the lawsuit.

First, Walker U-Stor took out an additional $200,000 loan from the bank in 2006, and Uhlmann signed a new guarantee for that amount. The Richardsons didn't sign any new documents in 2006, and there's no evidence they even knew of the additional loan. Their written guarantee covered renewals and substitutes for the original $2.67 million loan, but it didn't provide a guarantee of additional indebtedness. Still, Uhlmann sought contribution from the Richardsons for 24% of the entire deficiency to the bank, which included whatever was attributable to the original loan as well as whatever might be attributable to the additional $200,000 loan taken out in 2006.

Second, Uhlmann incurred $18,684.50 in attorney fees in selling the remaining property of Walker U-Stor so that the proceeds could be paid to the bank. Uhlmann also sought to assess 24% of that amount against the Richardsons.

A jury trial was held in September 2010. After the first day of trial, Uhlmann's counsel said that he would proceed on the equitable-contribution theory, though he also said that unjust enrichment might apply to the request that the Richardsons pay part of the $18,684.50 in attorney fees. Later, after the court had prepared jury instructions to submit the case to the jury under an unjust-enrichment theory, Uhlmann's counsel said that he was "willing to go forward on our equitable contribution claim," recognizing that equitable claims are decided by the court, not a jury. But he added that the Richardsons had requested a jury trial and that the question of whether the Richardsons had signed the guarantee agreement was a jury question.

The district judge then said that the case still would be presented to the jury under the unjust-enrichment theory: "Now I'm not go-

ing to make these folks sit through an entire trial because you're [now] going to decide to sort of kick the [unjust-enrichment] theory loose. . . . [A]t this point, it's going to them on unjust enrichment." Uhlmann's counsel replied, "All right," and the parties agreed upon an additional question that the jury would answer as to whether the Richardsons had signed a guarantee. The Richardsons objected to submitting the case under an unjust-enrichment theory and to the jury instructions about that legal theory.

The jury found that the Richardsons had signed a guarantee agreement, and the jury also ruled in favor of Uhlmann on the unjust-enrichment claim. As damages, Uhlmann had sought 24% of the $981,231.96 he had paid (an amount that comprised the total deficiency to the bank, $962,547.46, plus the attorney fees incurred in selling Walker U-Stor's property, $18,684.50), or $235,495.67. The jury awarded $182,165 in damages, and the district court entered judgment in that amount. Apparently because recovery on an alternate legal theory was not needed, the court's journal entry of judgment denied Uhlmann's claim for equitable contribution.

After the entry of judgment, Uhlmann had garnishment orders issued to a bank at which the Richardsons were thought to have one or more accounts. After that, the Richardsons posted a cash appeal bond (known as a supersedeas bond) of $230,000; the district court then stayed further proceedings to collect on the judgment, as authorized by K.S.A. 60-262(d). No money was collected through the filing of these garnishments.

Both parties have appealed to this court. The Richardsons contend on appeal that the district court should not have submitted an unjust-enrichment claim to the jury. Uhlmann argues in his cross-appeal that even if an unjust-enrichment claim wasn't appropriate, Uhlmann was entitled to recover under the equitable-contribution theory for the Richardsons' pro rata share of the deficiency to the bank. Uhlmann also argues that the jury award for unjust enrichment was proper.

## Usage Note

Lest we risk confusion over one aspect of legal word usage that comes up in this opinion, we offer this note. Traditionally, and especially in British legal usage, there were two words used to describe the situation where one person agreed to be responsible for a debt: used as a noun, it was a "guaranty," but used as a verb, it was "guarantee." Today, guarantee is more commonly used both as a noun and as a verb. See Garner, Garner's Dictionary of Legal Usage 399 (3d ed. 2011). We have used guarantee in this opinion, but you will sometimes see guaranty when we have quoted from or cited to another's work. We note as well that the document signed by the Richardsons in this case was titled, "COMMERCIAL GUARANTY." However spelled, we are all talking about the same thing.

## Standards of Review on Appeal

Whether one party can recover damages from another based on the legal theory of unjust enrichment presents a legal question that we must decide independently, without any required deference to the district court. *T.R., Inc. of Ashland v. Brandon*, 32 Kan. App. 2d 649, 655, 87 P.3d 331 (2004). We also exercise independent review in the determination of whether the legal rules of equitable contribution apply and, if so, how to apply them. There are no factual disputes that affect these determinations given the jury's finding that the Richardsons signed the guarantee agreement. We therefore determine the rules of equitable contribution and apply them as a matter of law, independently and without any required deference to the district court. See, *e.g.*, *Emprise Bank v. Rumisek*, 42 Kan. App. 2d 498, 504, 215 P.3d 621 (2009); *Downriver Com. Fed. Credit U. v. Penn Square Bank*, 879 F.2d 754, 758 (10th Cir. 1989).

We also must address the Richardsons' contention that Uhlmann waived his right of appeal by acquiescing in the judgment. That presents a question of our jurisdiction on appeal; that too is a legal question that we determine independently. *Alliance Mortgage Co. v. Pastine*, 281 Kan. 1266, Syl. ¶ 2, 136 P.3d 457 (2006).

## ANALYSIS

### I. *The Generic Rules for Unjust-Enrichment Claims Do Not Apply Here Because More Specific Ones for Contribution Do.*

The first issue in our appeal presents an odd battle. Uhlmann argues that the legal theory of unjust enrichment fits these facts, while the Richardsons claim that the relationship of coguarantors is governed by the law of contribution and the rules of suretyship, which apply when parties agree to be liable for another's debt. Uhlmann defends the jury's verdict in his favor on an unjust-enrichment theory; as a back-up argument, Uhlmann contends that if unjust enrichment isn't the right basis for his claim, he should still win on an equitable-contribution claim. Meanwhile, the Richardsons argue that the case shouldn't have been submitted to the jury on that theory at all. And as to contribution; the Richardsons point out that the district court entered judgment in their favor on the contribution claim.

But the way the parties have argued these legal theories hides the relationship between them. A contribution claim is based upon concepts of unjust enrichment. The law on contribution simply represents a specific application of more general unjust-enrichment principles.

Perhaps the best recognition of this comes in the Restatement (Third) of Restitution and Unjust Enrichment, published in 2011. Its authors recognized that the American Law Institute had already published the Restatement (Third) of Suretyship and Guaranty in 1996. So even though the law of contribution is based on unjust-enrichment principles, the Restatement on Restitution and Unjust Enrichment doesn't cover it because it has already been addressed in detail elsewhere:

"Some important topics in restitution receive more comprehensive treatment in other Restatements. Where they have not been specified by contract, the characteristic remedies of the law of suretyship (exoneration, indemnification, subrogation, and contribution) all enforce a liability founded on unjust enrichment, but the present Restatement does not duplicate the more specialized treatment of Restatement Third, Suretyship and Guaranty." Restatement (Third) of Restitution and Unjust Enrichment § 1, comment g (2011).

The problem here is that *more detailed* rules have been stated for contribution between coguarantors, while the general rules for unjust enrichment are left quite broad so that they may be applied in a variety of situations. The more detailed rules for contribution between coguarantors tell us that "[c]ontribution must be equally and ratably made" so that each guarantor shares based upon the guarantor's share of the debt. *Kee v. Lofton*, 12 Kan. App. 2d 155, 159, 737 P.2d 55 (1987). On the other hand, as reflected in the jury instructions used in our case, the determination of damages is more amorphous in the ordinary unjust-enrichment case. See *Leathers v. Leathers*, No. 08-1213-WEB, 2010 WL 1936137, at *19 (D. Kan. 2010) (unpublished opinion) (stating that the measure of damages for unjust enrichment is "the value of the benefit conferred"); PIK Civ. 4th 124.17 (stating that the measure of damages for unjust enrichment is "the reasonable worth" of what was provided under "reasonable expectation of being compensated").

Here, our jury was told to determine "the reasonable amount" of Walker U-Stor's debts paid "either directly or indirectly" by Uhlmann or his trusts "that should be paid" by the Richardsons to Uhlmann. The jury was also told that "[w]here a party contributes more than a party's share of another's debt and has a reasonable expectation of being compensated, the one benefited is responsible for paying the reasonable amount of the debt." The jury then awarded $182,165, an amount that we can't explain and can't tie in any way to the more detailed rules for contribution among guarantors, where the contribution "must be equally and ratably made." See *Kee*, 12 Kan. App. 2d at 159.

In a case like ours, which involves a claim for contribution among coguarantors, liability and damages must be determined under the special rules applied to that situation. These rules are based on unjust-enrichment notions, and unjust-enrichment cases may provide some useful guidance. But the case cannot be submitted to a jury under generic instructions that call for the award of a "reasonable amount" or that call for liability only when there is "a reasonable expectation of being compensated." The law of contribution imposes an implied agreement on the parties if they have not explicitly agreed otherwise, and the law of contribution also

determines—with fixed rules—the extent of that obligation. See *Kee*, 12 Kan. App. 2d at 159. We conclude that this case should not have been submitted to the jury under a generic unjust-enrichment legal theory.

We should add that there is no issue before us about a party's right to trial by jury. Whether the Richardsons signed the guarantee agreement was submitted to the jury, and neither the decision to do so nor the jury's verdict on that question have been challenged on appeal. As to any potential remand, neither party has suggested further jury proceedings: the Richardsons have argued that the equitable-contribution claim didn't present a jury question, and Uhlmann has not suggested on appeal that any remand would require a further jury trial. As we will discuss below, the damages due based on a contribution claim among the coguarantors here are capable of determination from the undisputed evidence, subject to any equitable defenses.

## II. *Subject to Any Equitable Defenses, the Richardsons Are Liable to Uhlmann for Their Pro Rata Share of the Loan Deficiency.*

We turn next to Uhlmann's argument that he is still entitled to recover against the Richardsons under an equitable-contribution theory. We have two primary questions to sort through here. First, does an equitable-contribution theory apply at all? Second, if it does, what amount do the Richardsons owe?

That second question becomes complicated, though, because—as the name "equitable contribution" implies—the right of one guarantor or surety to get contribution from a coguarantor or cosurety is an equitable one and thus subject to various equitable defenses. See generally Restatement (Third) of Suretyship and Guaranty § 56 (1996); Alces, The Law of Suretyship & Guaranty § 5:5 (2012). These defenses might affect the amount of any recovery; they could even eliminate the recovery altogether. We will set aside consideration of any defenses until we have first determined what the equitable-contribution rules would provide in the absence of a viable equitable defense.

We must address one other preliminary question up front. The district court's written judgment entered judgment *against*

Uhlmann on the equitable-contribution claim: "The Court takes up plaintiff's claim of equitable contribution and denies said claim, thereby resolving the sole remaining issue in the case." The Richardsons urge that this be treated, as it appears to be, as a judgment on the merits against this claim. If so, we would reverse only if the district court abused its discretion in ruling against Uhlmann on the merits of his equitable claim, see *Fleetwood Enterprises v. Coleman Co.*, 37 Kan. App. 2d 850, 864-65, 161 P.3d 765 (2007), something that would be hard to do here.

But we do not believe the district court ruled on the merits. The court made no oral pronouncements that it had rejected the equitable-contribution claim on its merits. When discussing whether to submit the unjust-enrichment claim to the jury, the court said of the equitable-contribution claim that it would "set that aside" for later consideration and that the jury verdict "may abrogate the need for [the court] to even look at equitable contribution." We acknowledge that the court also said that "the claim for equitable contribution is extremely thin," but that was a comment made before the jury concluded that the Richardsons had signed the guarantee. We also recognize that a district court's journal entry of judgment in a civil case controls over its prior oral statements from the bench. *Steed v. McPherson Area Solid Waste Utility*, 43 Kan. App. 2d 75, 87, 221 P.3d 1157 (2010). Here, though, the district court's written denial of the equitable-contribution claim is consistent with its earlier statement that the jury verdict "may abrogate the need" for the court even to consider equitable contribution. After that jury verdict, the court appears to have considered the equitable-contribution claim only as an alternative legal theory that was no longer needed given the jury award for unjust enrichment. Only after that verdict did the court "deny" the equitable-contribution claim—without making any factual findings that would support a merits ruling to that effect.

We proceed then to determine whether an equitable-contribution theory fits our facts, and it is a perfect fit: "The right to contribution . . . is based on an implied agreement that if the guaranty is enforced, each guarantor will contribute his or her just proportion of the amount for which he or she might be held liable." *Kee*,

12 Kan. App. 2d at 159. That contribution "must be equally and ratably made," 12 Kan. App. 2d at 159, something that is easily done here.

Uhlmann had guaranteed 60% of the bank loan but paid 100% of the loan deficiency to the bank. The Richardsons had guaranteed 24% of the loan, so their share would be 24% and that share can be easily calculated.

To do so, we first remove two items that the Richardsons neither guaranteed payment of nor agreed to pay: the additional $200,000 loan Walker U-Stor obtained in 2006 and the $18,684.50 in attorney fees Uhlmann incurred in selling the remaining property of Walker U-Stor (property sold so that the proceeds of that sale could be paid to the bank).

We subtract the $200,000 loan later obtained by Walker U-Stor based on the fact that much more than $200,000 was still owed when Walker U-Stor ceased doing business and on the assumption that loan payments went first to pay the original note, not the additional $200,000 loan. See *State v. Guaranty Co.*, 81 Kan. 660, Syl. ¶ 5, 106 P. 1040 (1910) (applying first-in, first-out rule to payments on multiple debts without advance agreement on how to apply payments); *In re Gibson*, 16 B.R. 257, 268-69 (Bankr. D. Kan. 1981) (same). The Richardsons' guarantee covered the original $2.67 million note and "renewals" or "substitutions" for that note; it had no provision covering additional advances made to Walker U-Stor.

As to the attorney fees, such fees are ordinarily not recoverable under the "American rule" unless the parties specifically agree or a statute provides for the recovery of attorney fees. *Robinson v. City of Wichita Retirement Bd. of Trustees*, 291 Kan. 266, 279, 241 P.3d 15 (2010). Here, there was no agreement under which the Richardsons would pay Uhlmann's attorney fees related to selling Walker U-Stor's property. In addition, there was no evidence that the Richardsons had notice that Uhlmann was incurring these fees and would be seeking reimbursement for them. See Restatement (Third) of Suretyship & Guaranty § 55, comment c (1996) (noting that right to reimbursement of reasonable expenses in conjunction

with performing duties as guarantor depends upon notice to co-surety).

Subtracting those amounts from the $981,231.96 Uhlmann paid leaves $762,547.46, and 24% of that amounts to $183,011.39. Subject to any equitable defenses, that would be the Richardsons' contributive share.

We should add that the rule we cited from *Kee* applied equitable contribution when "the guaranty is enforced," while here Uhlmann made good his guarantee without waiting for the bank to sue him. The Richardsons do not suggest that this makes a difference, and we conclude it does not. *Kee* also noted that the right to seek contribution arises when "a guarantor has paid more than his or her share." 12 Kan. App. 2d 155, Syl. ¶ 5. If one coguarantor makes payment for more than his or her share, that party has a right of contribution against other guarantors. See Restatement (Third) of Suretyship & Guaranty § 55 (1996).

We turn last to the subject of equitable defenses. The Richardsons asserted several defenses, including ones based on acts Uhlmann took in wrapping up Walker U-Stor's business affairs. If Uhlmann did something that resulted in increased liability to the Richardsons, it could provide an equitable defense. But deciding that issue would require making factual findings and then exercising the discretion given to the trial court when considering equitable claims. Those are the functions of the trial court, not an appellate court.

We therefore remand the equitable-contribution claim to the district court for its further consideration. If the court finds no equitable defenses were proven, then Uhlmann is entitled to judgment for $183,011.39. If the court finds that equitable defenses were proven, then it must make appropriate factual findings and exercise its discretion over this equitable claim.

III. *Uhlmann Did Not Lose His Right to Appeal by Getting the Richardsons to Post an Appeal Bond But Not Collecting Any Money on the Judgment.*

The Richardsons contend that Uhlmann lost his right to appeal when he issued garnishment orders trying to collect on the judg-

ment—even though no funds have yet been collected. A party's voluntary acceptance of the benefits or burdens of a judgment generally constitutes acquiescence in the judgment and eliminates the right of appeal. *Hemphill v. Ford Motor Co.*, 41 Kan. App. 2d 726, Syl. ¶ 1, 206 P.3d 1 (2009). Thus, if a party actually collects money obtained through a judgment, the party who collected funds—and thus accepted a benefit from the judgment—loses the right to appeal. *Hemphill*, 41 Kan. App. 2d at 728-29.

But here, Uhlmann collected no funds. Once he filed the garnishment, the Richardsons filed a cash appeal bond and the district court stayed further proceedings to collect on the judgment while the appeal was ongoing.

The Richardsons have cited one of our court's past decisions, *Almack v. Steeley*, 43 Kan. App. 2d 764, 230 P.3d 452 (2010), in support of their argument that Uhlmann lost his right to appeal, and we agree that *Almack* supports them. The facts in *Almack* are not materially different than those we face: in *Almack*, the judgment creditor issued a general order in aid of execution that collected nothing, while here Uhlmann issued a garnishment that collected nothing. The *Almack* court concluded that the judgment creditor had acquiesced in the judgment and lost the right to appeal. 43 Kan. App. 2d at 776.

But we have concluded that the result in *Almack* was not required by any of the precedents it considered and is contrary to sound policy arguments. This is an important conclusion because panels of the Kansas Court of Appeals are not bound by prior rulings of another panel. *State v. Urban*, 291 Kan. 214, 223, 239 P.3d 837 (2010). While we must carefully consider each precedent cited to us, we also must uphold our duty to correctly determine the law in each case that comes before us. In doing so, we sometimes find that we must respectfully disagree with the opinion of another panel.

The *Almack* court recognized that most courts hold that a judgment creditor must actually receive some tangible benefit—like collecting part of the money owed—to be deemed to have acquiesced in a judgment so as to lose the right to appeal. 43 Kan. App. 2d at 771-73; see *DiFrancesco v. Particle Interconnect Corp.*, 39

P.3d 1243, 1247 (Colo. App. 2001) ("Most courts that have considered the issue . . . deny an appeal only when the party has received some benefit of tangible value under the judgment . . . ."). But it concluded that Kansas precedents put us in a more restrictive posture in which even a failed attempt to collect money on the judgment forfeits appellate rights. 43 Kan. App. 2d at 773-75. Then-Judge Nancy Caplinger (now Justice Nancy Moritz) dissented, 43 Kan. App. 2d at 776-78, and we agree with her that none of the published precedents cited by the *Almack* court called for a Kansas court to enforce such an aggressive version of the acquiescence doctrine.

The published cases relied upon by the *Almack* majority were *McDaniel v. Jones*, 235 Kan. 93, 95, 679 P.2d 682 (1984); *Tice v. Ebeling*, 238 Kan. 704, 713, 715 P.2d 397 (1986); and *Harsch v. Miller*, 288 Kan. 280, 200 P.3d 467 (2009). None of these cases require the result reached in *Almack* and urged in this case by the Richardsons.

The *Almack* majority said it "rel[ied] heavily" on *McDaniel*. *Almack*, 43 Kan. App. 2d at 774. But the *McDaniel* court recognized that the acquiescence rule is a form of implied waiver of a party's rights, something that shouldn't be done lightly. Thus, the court noted the general "rule that a waiver is not implied from measures taken by an appellant in defense of and to protect his rights or interest." 235 Kan. at 104; accord *Alliance Mortgage Co.*, 281 Kan. at 1271-72; *Bank IV Wichita v. Plein*, 250 Kan. 701, Syl. ¶ 6, 830 P.2d 29 (1992). That's what Uhlmann has done here: he garnished the Richardsons' bank accounts to spur them to file an appeal bond, which protects Uhlmann's ability to collect the judgment after the appeal. The *McDaniel* court found acquiescence, but that situation isn't analogous to ours. Acquiescence was found in *McDaniel* because the judgment creditor in a foreclosure action *forced sale of the property* while the appeal was pending. That judgment creditor gained a tangible benefit; Uhlmann did not.

Neither *Harsch* nor *Tice* compels the result reached by the *Almack* court, either.

The *Almack* court's citation of *Harsch* was merely to "distinguish cases where the actions of the acquiescing party were done invol-

untarily." *Almack*, 43 Kan. App. 2d at 773; see *Harsch*, 288 Kan. at 292 (noting that only voluntary compliance with the judgment constitutes acquiescence). Indeed, if a party is forced by its opponent to take an action consistent with the judgment, that doesn't constitute acquiescence. So if a party's bank account is garnished by the other party, the party whose funds have been involuntarily taken through garnishment hasn't acquiesced in the judgment. *Younger v. Mitchell*, 245 Kan. 204, 207-08, 777 P.2d 789 (1989); *Van Nguyen v. Ortiz*, No. 94,884, 2007 WL 881848, at *4 (Kan. App. 2007) (unpublished opinion). But that rule doesn't tell us whether a party who voluntarily takes some action toward enforcing the judgment—but receives no money or property—should be deemed to have acquiesced in the judgment so as to lose appellate rights.

The acquiescence ruling in *Tice* was merely that an attorney waived the right to appeal a trial court's evidentiary ruling during trial. The attorney contended that a witness' testimony varied from what he'd said in a deposition, and the court offered a recess to let the attorney check the deposition transcript. The attorney elected to proceed, which our Supreme Court held waived any right to appeal on limits the court imposed on cross-examination. 238 Kan. at 712-13. In making this ruling about an evidentiary issue, the court did say that "anything which savors of acquiescence in a judgment cuts off the right of appellate review." 238 Kan. at 713. But reading those words to require a finding of acquiescence in our case would give those words a meaning they certainly did not bear in *Tice*.

More importantly, we are convinced that there are good reasons in support of what *Almack* conceded was the majority rule, under which some tangible benefit of the judgment must be received before the party's appellate rights will be taken away. To place this into context, we need to consider three underlying aspects of the situation we are considering—what it normally takes to collect a judgment, what it normally takes to appeal a judgment, and what it normally takes before we declare the implied waiver of important rights.

One of the surprises litigation holds for most laypeople is that getting a money judgment against someone is just the first step. Nothing happens automatically to get the judgment debtor to pay up. Instead, the judgment creditor must go out and collect it, and statutes provide a variety of options to the judgment creditor to try to do so. If the judgment creditor can find out where the judgment debtor has a bank account, that account can be garnished for its current balance, up to a bit more than the judgment amount (to allow for interest and costs of the suit). See K.S.A. 60-731, 60-733. If the judgment debtor earns wages, those wages can be garnished—subject to statutory limits on wage garnishments. See K.S.A. 60-734. If the judgment creditor doesn't know where to go to find funds or property of the judgment debtor, then the judgment debtor can be called into court for an examination under oath "in aid of execution." See K.S.A. 60-2419. The process of collecting a judgment can be a difficult one, and often parties who become judgment debtors have diminishing assets and more than one creditor.

In the meantime, one of the parties in the case—either the judgment debtor or judgment creditor—may want to appeal some ruling made by the district court. The rules allow the judgment debtor who appeals to get a stay of execution on the judgment (preventing collection efforts) by posting a bond approved by the court. See K.S.A. 60-262(d). The bond is called a supersedeas bond, and it suspends the judgment creditor's authority to collect on the judgment. See Black's Law Dictionary 1576 (9th ed. 2009).

Let's turn next to how an appeal normally works. Most civil cases come on appeal to the Kansas Court of Appeals, and it takes about a year from the time an appeal is filed to when it is heard on one of our dockets, with a decision rendered soon after. But a party may request further review by the Kansas Supreme Court, something that's discretionary. If our Supreme Court decides to hear the case, that will add at least another year before the case is set on a docket, heard, and decided.

So if a judgment creditor can take *no* action at all other than asking if the judgment debtor might want to consider filing a supersedeas bond, then the judgment creditor will be unprotected

for perhaps 2 years or more. And not many judgment debtors will post a supersedeas bond when the judgment creditor's inquiry is, "We're not going to engage in any effort to collect the judgment so that we don't waive our appellate rights, but would you mind posting a supersedeas bond while the appeal is pending to protect our right to collect the judgment?" The only effective means a judgment creditor has to spur the judgment debtor into filing an appeal bond—which protects the judgment creditor's right to collect the judgment while the appeal goes on—is by taking *some* action toward execution on the judgment.

Finally, let's consider acquiescence for what it is—an implied waiver of rights. The acquiescence doctrine is based on the concept that a party who acquiesces in a judgment "impliedly waives" the right to appeal it. *In re Estate of Hill*, 179 Kan. 536, Syl. ¶ 1, 297 P.2d 151 (1956); *Harmon v. James*, 146 Kan. 205, 207-08, 69 P.2d 690 (1937); see generally 36 C.J.S., Federal Courts § 419 (noting that a party who acquiesces in judgment's validity "impliedly waives" right to appeal). Since implied waivers aren't favored, acquiescence should be found only when the party's actions " 'clearly and unmistakably show an inconsistent course of conduct or an unconditional, voluntary and absolute acquiescence.' " *James v. Amrine*, 157 Kan. 397, 403, 140 P.2d 362 (1943) (quoting 4 C.J.S., Appeal and Error § 212, p. 397); see generally *Orgeron v. Sec. Indus. Funeral Homes*, 690 So. 2d 243, 245 (La. App. 1997) ("Appeals are favored in law and forfeiture of a party's right to an appeal through acquiescence should be decreed only when the party's intention to acquiesce and to abandon his right of appeal is clearly demonstrated."); 4 C.J.S., Appeal and Error § 275 (citing the rule quoted above in *James*); 5 Am. Jur. 2d, Appellate Review § 578 ("The loss of a party's right to appeal through acquiescence should be decreed only when the party's intention to abandon the right of appeal is clearly demonstrated.").

In context, then, we conclude that there is no sound policy reason to deem a judgment creditor to have waived its appellate rights merely because it has sufficiently invoked collection procedures so as to spur the judgment debtor into posting an appeal bond—when no money has been collected and no property sold to partially sat-

isfy the judgment. We recognize that this results in a practical choice to be made by the judgment debtor when, as here, the judgment creditor garnishes a bank account. Had the Richardsons allowed Uhlmann to collect money from the garnished account, that presumably would have resulted in Uhlmann losing his appellate rights through acquiescence under Kansas law because he would have received a tangible benefit from the judgment through partial collection on the judgment. And that would *not* have affected the Richardsons' appellate rights because the funds would have been taken from them involuntarily. See *Younger*, 245 Kan. at 207-08; *Van Nyugen*, 2007 WL 881848, at *4.

This may mean that judgment creditors who have issues to take up on appeal may want to start with a collection effort that's not likely to garner immediate funds, like an aid-in-execution hearing or mere issuance of a general order of execution to the sheriff (which is usually returned unsatisfied). Those are choices for the parties to make in each case. The question before us is whether the mere issuance of some execution on a judgment should be deemed an implied waiver of appellate rights when no funds are collected and an appeal bond is posted. We see no policy reason to do so and find no published Kansas appellate opinion requiring us to do so. All that Uhlmann did here was to cause the Richardsons to post a supersedeas bond, which protected Uhlmann's rights (as well as the Richardsons') pending conclusion of the appeal. And acquiescence is not to be implied from actions a party takes to protect its rights. *Alliance Mortgage Co.*, 281 Kan. at 1271-72; *Plein*, 250 Kan. 701, Syl. ¶ 6; *McDaniel*, 235 Kan. at 104; 4 C.J.S., Appeal and Error § 275. We therefore conclude that Uhlmann did not acquiesce in the judgment so as to waive his appellate rights.

The district court's judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.