NOT DESIGNATED FOR PUBLICATION

No. 122,439

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CYBERTRON INTERNATIONAL, INC.,
*Appellee/Cross-Appellant*,

v.

MICHAEL CAPPS,
*Appellant/Cross-Appellee*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; DEBORAH HERNANDEZ MITCHELL, judge. Opinion filed January 14, 2022. Affirmed in part and dismissed in part.

*Martin J. Peck*, of Wellington, for appellant/cross-appellee.

*Michael L. Baumberger*, of Klenda Austerman LLC, of Wichita, for appellee/cross-appellant.

Before ARNOLD-BURGER, C.J., SCHROEDER, J., and RICHARD B. WALKER, S.J.

SCHROEDER, J.: Michael Capps was the cofounder and coowner of Integrated Technologies of Kansas (ITK). In 2015, Capps and his business partner sold ITK to Cybertron International, Inc. (Cybertron), for which Capps was given cash and Cybertron stock and was hired by Cybertron. He entered into a restrictive covenant agreement (RCA) with Cybertron, which contained noncompete, nondisclosure, and nonsolicitation clauses, as well as a liquidated damages clause, providing for $50,000 in damages for each breach of the RCA. Cybertron later terminated Capps' employment. Thereafter, Cybertron filed suit against Capps, alleging 11 breaches of the RCA and seeking a total of $550,000 in liquidated damages.

1

The district court found in Cybertron's favor on 3 of its 11 claims, awarding $50,000 for each. The district court did not individually grant judgment on the eight remaining claims but essentially aggregated the damages for all other breaches and awarded Cybertron an additional $50,000. In total, the district court awarded Cybertron $200,000 and any applicable postjudgment interest, attorney fees, and costs. But the district court denied Cybertron's request for prejudgment interest.

Capps timely appeals, arguing the liquidated damages provision is invalid as a matter of law because it encompasses too broad a range of conduct for the liquidated damages figure to be reasonable in relation to the various breaches that could occur. Cybertron cross-appeals, arguing the district court should have awarded $50,000 for each of the eight remaining breaches and further asserts it is entitled to prejudgment interest. Capps argues Cybertron waived its right to cross-appeal by initiating garnishment proceedings. Cybertron argues Capps waived his right to appeal because he did not post a supersedeas bond and approximately $3,000 has been paid on the judgment through garnishments issued by Cybertron.

We find Cybertron waived its right to cross-appeal by aggressively pursuing garnishment proceedings against Capps. Accordingly, we dismiss Cybertron's cross-appeal. However, we find Capps did not waive his right to appeal because his actions or inactions with respect to Cybertron's garnishment efforts were not voluntary and do not show he acquiesced in the judgment. But we find the majority of Capps' substantive arguments unpersuasive. Here, the liquidated damages clause is not an invalid penalty provision; therefore, it is enforceable. Thus, we affirm the district court's award of $200,000 plus costs, attorney fees, and postjudgment interest to Cybertron.

FACTS

In September 2015, Cybertron purchased customer lists, existing customer contracts, and accounts receivable from one of its competitors, ITK, which was owned by Capps and Garland Egerton. Capps was paid an initial sum of cash and was given Cybertron stock. He further agreed to accept additional monthly payments from Cybertron to ITK and was hired by Cybertron as its vice president of technology services. Capps also entered into a 60-month RCA with Cybertron beginning September 1, 2015, which contained, among other things, noncompete, nondisclosure, nonsolicitation, and liquidated damages clauses. In relevant part, the RCA provided:

"4. <u>Covenant Not to Compete.</u>  By the execution hereof, [Capps] agree[s] that, during the Term, [Capps] shall not, directly or indirectly, own, have a proprietary interest in, be engaged by or serve as a consultant to, or in any other capacity for, or establish any business relationship with, any firm, individual, partnership, joint venture, corporation, limited liability company, or other entity whatsoever, of whatever nature which shall in any means or manner be engaged in the information technology services business, including consulting, systems integration, website design and hosting, software development and voice over Internet protocol solutions and the computer hardware manufacturing and sales business within any area or market that [Cybertron] is actively selling or doing business in. . . .

"5. <u>Non-Disclosure of Confidential Information.</u>  During and after the Term, unless authorized in writing by [Cybertron], [Capps] shall not disclose any Confidential Information of [Cybertron] or of [Cybertron's] affiliates, including, without limitation, that which relates to (i) the Assets; (ii) the Assumed Liabilities; and/or (iii) the Business that [Cybertron] purchased pursuant to the Purchase Agreement to any person or entity, nor shall [Capps] use the same for any purpose at any time. . . .

"6. <u>Non-Solicitation.</u>  During the Term, [Capps] shall not (i) contact, for the purpose of competitive business solicitation, any person who is a supplier, vendor, employee, consultant, prospect, customer or client of [Cybertron] or an affiliate of

[Cybertron], or (ii) contact any employee or executive of [Cybertron] or an affiliate of [Cybertron] for the purpose of offering him or her employment with any person other than [Cybertron].

. . . .

"8. Liquidated Damages. [Capps] agree[s] that any breach of the covenants or agreements contained in Sections 4, 5 and 6 shall cause irreparable injury to [Cybertron] and its affiliates for which there is and shall be no adequate remedy at law. [Cybertron] shall be entitled, as liquidated damages from [Capps], to Fifty Thousand United States Dollars (US$50,000) for each breach in addition to all other remedies, including, without limitation, injunction remedies. . . ."

In June 2016, Capps' employment with Cybertron was terminated. Shortly thereafter, a competitor, Century Technology Solutions (Century), which was owned by Chase Davis, acquired six of Cybertron's customers with whom Capps had previously worked while employed at Cybertron. Capps admitted he provided "business coaching" to Davis in 2016 and later became an employee of Century in 2017. Capps provided Davis with advice regarding business financing, LLC formation, business management, and the use of Quickbooks software for finance and accounting purposes. Capps also believed it was possible Davis may have asked for advice on pricing of services and equipment, but Capps could not recall any specifics.

In August 2016, Capps referred Davis to Reflexion, a company that provides email, antivirus, and various other computer security services. Capps previously had a relationship with Reflexion while at ITK. Following Capps' referral, Davis became a customer of Reflexion for email security services. In October 2016, Capps referred Davis to Nick Ryan, who worked with Cox Communication's agent program. Capps was aware that if Davis referred Century's customers to Cox, Davis could potentially receive a referral fee under the agent program. However, Capps was unaware if Davis ever entered into an agreement with Cox or received any money under the referral program.

In January 2017, Capps referred Davis to Glenda Alcantar of Fidelity Bank so Davis could obtain the necessary bank accounts and services for Century. Capps was trying to help Davis separate his personal and business banking needs as Davis had reorganized Century from a sole proprietorship to a limited liability company—CTS, LLC—in December 2016. Around that time, Capps had been in contact with Kathi Buche, an employee of one of Cybertron's customers, Envision. Buche told Capps that Envision was having issues with its Mac computers. Davis subsequently sent Buche an email stating Capps told him Envision may have need for ongoing Mac support.

In March 2017, Capps became an employee of CTS as its business development manager, a role in which he provided management and consulting services for CTS's customers. But Capps spent the majority of his time keeping track of CTS's finances and accounts because the business had grown to the point Davis could no longer do so alone.

On March 17, 2017, Capps sent an email from his CTS email address to Elizabeth Harshfield, the owner of Exhibit Arts, stating:  "It's been a while since we've had a chance to catch up on life and business," and asking whether Harshfield "had any time next week [Capps] could drop by and say hello." Capps denied the purpose of his email was to solicit business from Exhibit Arts. However, Harshfield stated:  "It was [her] interpretation [Capps] was no longer working for Cybertron and he had gone into business with someone else or something else and wanted to talk to [Exhibit Arts] about it." Capps emailed Whit Hickman of American Bonanza Society (ABS) the same day, informing Hickman he had joined CTS and inquired whether Hickman was available to visit with him the next week. Capps admitted he intended to solicit ABS's business for CTS.

Cybertron filed suit against Capps, Davis, CTS, and Aaron DeHaven, a former employee of ITK and Cybertron who later worked for Davis. However, none of the other

named defendants are parties to this appeal. Specific to Capps, Cybertron alleged he committed 11 violations of the RCA by:

- Providing advice to Davis and Century/CTS regarding business finance, LLC formation, pricing models, and business management issues (Counts 1-4);
- referring Davis to Reflexion, Cox, and Fidelity Bank to provide services for Century/CTS (Counts 5-7);
- obtaining employment with Century/CTS, a competitor of Cybertron, in violation of the noncompete clause (Count 9); and
- soliciting or attempting to solicit business from Cybertron's customers— Envision, Exhibit Arts, and ABS—on behalf of CTS (Counts 8, 10, and 11).

Following a bench trial, the district court found three violations of the RCA— Capps becoming an employee of CTS, and Capps soliciting business from Exhibit Arts and ABS on behalf of CTS. The district court awarded Cybertron liquidated damages of $50,000 for each of those violations. Regarding Capps' contact with Envision, the district court found there was an exchange of emails and other communication between Capps, Davis, and Buche, but Buche had not testified at trial and it was unclear "from the emails as to who contacted who." Therefore, the district court declined to award liquidated damages for Count 8 on its own.

As to Counts 1 through 4, the district court found any advice Capps gave Davis regarding business management issues was not proprietary information and there was nothing "discussed that . . . provided . . . or could have provided any detriment to Cybertron, so there will be no liquidated damages provided for that." As to Capps introducing Davis to Cox, the district court found:  "[T]he testimony [was] vague on who contacted Cox or what exactly Cox did and who contacted who. So there won't be . . . $50,000 damages just for that." With regard to Capps referring Davis to Fidelity Bank,

6

the district court stated: "[T]hat's the same thing as banking issues that were gone through in [Counts] one through four and so I will not be [awarding] $50,000 for that."

While it expressly declined to individually award Cybertron liquidated damages for Counts 1 through 8, the district court found that, in the aggregate, those violations showed: "Mr. Capps provided consultation to CTS and to Mr. Davis to make his business successful. All of those put together and so there will be a $50,000 liquidated damages provision that will be assessed against Mr. Capps for that."

In total, the district court ordered Capps to pay Cybertron $200,000 in liquidated damages as well as attorney fees and postjudgment interest. The district court denied Cybertron's request for prejudgment interest because the RCA did not provide for it. The district court further acknowledged Capps had argued the liquidated damages clause was an invalid penalty provision and, therefore, unenforceable, but concluded: "The liquidated damages amount of $50,000 is more than reasonable and the liquidated damages provision is not a penalty." Capps timely appealed. Cybertron timely cross-appealed. Additional facts are set forth as necessary herein.

## ANALYSIS

The primary issue for us to resolve is quite straightforward: Is the liquidated damages clause invalid as a matter of law? As later explained herein, we find the liquidated damages clause valid and enforceable. Next, we must decide whether Cybertron waived its right to cross-appeal by initiating garnishment proceedings against Capps, because Cybertron claims it is entitled to additional liquidated damages and interest under the RCA. Because the issues on appeal and cross-appeal—or the necessity to address them—stem from Capps' challenge to the liquidated damages clause on its face, we must also decide whether Capps waived his right to appeal by failing to stay execution of the judgment.

7

*Standards of Review and Applicable Legal Principles*

*Waiver or Acquiescence*

"Acquiescence to a judgment cutting off the right of appellate review occurs when a party voluntarily complies with a judgment by assuming the burdens or accepting the benefits of the judgment contested on appeal. A party that voluntarily complies with a judgment should not be allowed to pursue an inconsistent position by appealing from that judgment. [Citations omitted.]" *Alliance Mortgage Co. v. Pastine*, 281 Kan. 1266, 1271, 136 P.3d 457 (2006); *Heartland Presbytery v. Presbyterian Church of Stanley, Inc.*, 53 Kan. App. 2d 622, 635, 390 P.3d 581 (2017). Whether a party acquiesced to a judgment involves jurisdiction, which is a question of law subject to unlimited review. *Alliance Mortgage Co.*, 281 Kan. at 1271; *Security Bank of Kansas City v. Tripwire Operations Group*, 55 Kan. App. 2d 295, 300, 412 P.3d 1030 (2018).

*Contract Interpretation*

An appellate court exercises unlimited review over the interpretation and legal effect of written instruments and is not bound by the lower court's interpretations or rulings. *Born v. Born*, 304 Kan. 542, 554, 374 P.3d 624 (2016). Whether a restrictive covenant is void for being contrary to public policy is a question of law, and an appellate court's review of that question is also unlimited. *Varney Business Services, Inc. v. Pottroff*, 275 Kan. 20, 39, 59 P.3d 1003 (2002).

"'The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction. [Citations omitted.]'" *Peterson v. Ferrell*, 302 Kan. 99, 104, 349 P.3d 1269 (2015). However,

8

"'[a]n interpretation of a contractual provision should not be reached merely by isolating one particular sentence or provision, but by construing and considering the entire instrument from its four corners. The law favors reasonable interpretations, and results which vitiate the purpose of the terms of the agreement to an absurdity should be avoided.' [Citations omitted.]" *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 963, 298 P.3d 250 (2013).

*Discussion*

*Cybertron has waived its right to cross-appeal.*

We find Cybertron has waived its right to cross-appeal by aggressively pursuing collection on its judgment through garnishment proceedings. In doing so, Cybertron has accepted the benefits of the judgment and, therefore, acquiesced to it. Cybertron has obtained multiple garnishment orders, requesting garnishment of Capps' wages as well as funds held in Capps' bank accounts, seeking amounts not to exceed between $215,000 and $236,500. This garnishment figure exceeds the district court's total award of $200,000, although the additional amount generally accounts for costs, attorney fees, and postjudgment interest. As provided by K.S.A. 2020 Supp. 60-733, a garnishment order cannot exceed 110% of the total judgment. The portion of the judgment Cybertron claims it agrees with is $150,000, but its requests for garnishment are well in excess thereof.

Contrary to the arguments in its reply brief, Cybertron has not limited its efforts in collecting on the judgment to only those portions of the judgment it agrees with. There is no distinction as to the amount and identity of the funds Cybertron sought and collected and the claims to which they relate. Cybertron has tried to collect on the full judgment as it now exists and taken steps beyond merely protecting its judgment. It cannot now take an inconsistent position on appeal by arguing the district court's judgment was incorrect. See *Alliance Mortgage Co.*, 281 Kan. at 1271.

9

In *Almack v. Steeley*, 43 Kan. App. 2d 764, 775, 230 P.3d 452 (2010), the majority of the panel held the judgment creditor waived its right to appeal by commencing proceedings in aid of execution on the judgment. The *Almack* majority correctly noted: "The test for acquiescence is whether the position taken by the party on appeal is inconsistent with the judgment." 43 Kan. App. 2d at 770; see *Younger v. Mitchell*, 245 Kan. 204, 206, 777 P.2d 789 (1989). The ultimate decision of the *Almack* majority appears somewhat beyond the typical boundaries Kansas appellate courts have applied in deciding whether a party has waived its right to appeal. Nevertheless, the *Almack* majority provided a thorough framework and useful historical overview of the waiver doctrine as applied by our appellate courts. 43 Kan. App. 2d at 770-75.

In contrast to *Almack*, the panel in *Uhlmann v. Richardson*, 48 Kan. App. 2d 1, 17-18, 287 P.3d 287 (2012), held a judgment creditor did not waive its right to appeal merely by issuing garnishment orders because it did not collect any money to apply on the judgment. Rather, the purpose of issuing the garnishment orders was to compel the judgment debtor to post an appeal bond, thereby providing security to the judgment creditor while the appeal was pending. However, the *Uhlmann* panel indicated the judgment creditor would have waived its right to appeal had it collected on the judgment through garnishment. But *Uhlmann* found the judgment debtor would not have waived its right to appeal had funds been garnished because any such action would have been involuntary. 48 Kan. App. 2d at 17-18.

*Uhlmann* draws a reasonable line at the judgment creditor's collection of payment on the judgment as the threshold for acquiescence. As our Supreme Court noted in *McDaniel v. Jones*, 235 Kan. 93, 103, 679 P.2d 682 (1984):

> "'A party who enforces payment or satisfaction of a judgment or decree in his favor, by suing out execution or otherwise, generally waives his right to bring or prosecute an appeal or writ of error, although the execution was ordered under a

10

misapprehension, for which appellee was not responsible. Under this general rule a right of appeal is waived, even though appellant claims that the judgment is for less than he was entitled to recover, unless there is a statutory provision to the contrary. . . .

"'However, the right to appeal or bring error is not waived where the judgment or decree is of such a character, or the circumstances are such, that there is no inconsistency between such enforcement and the appeal or proceeding in error . . . .'" 235 Kan. at 103 (quoting 4 C.J.S., Appeal and Error § 220).

Although Cybertron indicated at oral argument it had collected roughly $3,000, the extent to which it has successfully collected on the judgment is not determinative. The fact is Cybertron sought garnishment for the full amount of the judgment—$200,000 plus interest and fees. That judgment represents three awards of $50,000 in full, and the other $50,000 is effectively an aggregation by the district court of Cybertron's eight remaining claims. In other words, the $200,000 judgment upon which Cybertron has collected in part through garnishment encompasses *all* of Cybertron's claims. Thus, the judgment is not "'of such a character . . . that there is no inconsistency between such enforcement [of the judgment] and the appeal . . . .'" 235 Kan. at 103.

While Cybertron may have collected far less than the judgement granted, and less still than what it claims it is entitled to, there is no way to distinguish the identity of the funds collected and the claim(s) to which they apply based on the garnishment orders Cybertron obtained. Had Cybertron limited its collection efforts to only the portion of the judgment it agrees with—$150,000 for three breaches in full—this analysis could be different. See 235 Kan. at 103. But Cybertron's actions here are similar to another example of waiver cited in *McDaniel*:

"'A mortgagee cannot appeal from a judgment or decree of foreclosure, after judgment or decree has been satisfied, by his causing a sale to be made of the mortgaged premises thereunder. In such a case the mortgagee waives his right to appeal from that

part of the decree which gives judgment for a less sum than is claimed to be due . . . .'"
235 Kan. at 103 (quoting 4 C.J.S., Appeal and Error § 221).

Cybertron's primary complaint is the district court failed to award judgment in full for each of its eight remaining claims. In effect, Cybertron does not dispute the district court's determination Capps committed various breaches of the RCA and Cybertron is entitled to *some* amount of liquidated damages; rather, Cybertron takes issue with the manner and extent to which those points were resolved in its favor below. In a largely analogous context, the panel in *Hemphill v. Ford Motor Co.*, 41 Kan. App. 2d 726, 728-29, 206 P.3d 1 (2009), held a judgment creditor waived its right to appeal the resolution of its claim in arbitration where it accepted payment for the arbitration award. Simply put, *Hemphill* stands for the proposition that *how* the judgment was decided cannot be appealed by a party who accepts the benefit of that judgment by collecting payment thereon. See 41 Kan. App. 2d at 728-29.

We agree with the reasoning in *Hemphill* and believe the same rationale precludes Cybertron from appealing the district court's decision to aggregate eight of its claims into a single liquidated damages award. Cybertron's garnishment requests, upon which it has collected in part, include the totality of the district court's award—three awards for breaches in full, a single aggregated award for the eight remaining breaches, postjudgment interest, and fees.

In its cross-appeal, Cybertron also asserts it is entitled to prejudgment interest. Cybertron has availed itself of the benefit of the full judgment below in its collection efforts, including applicable interest and fees. We cannot allow Cybertron to take an inconsistent position on appeal by seeking additional liquidated damages and interest. See *McDaniel*, 235 Kan. at 103.

12

We note other decisions from our appellate courts holding there is a "protective measure exception" to the doctrine of waiver by acquiescence. *Alliance Mortgage Co.*, 281 Kan. at 1271-72 (purchasers of property in foreclosure sale did not waive right to appeal by accepting redemption funds because failure to accept funds would have subjected buyers to unnecessary interest payments on loan used to finance purchase); see *Uhlmann*, 48 Kan. App. 2d at 17-18 (judgment creditor did not waive appeal by obtaining garnishment orders without collecting payment in order to compel judgment debtor to post appeal bond).

Here, however, Cybertron could have taken, and did take, other measures to protect its judgment. Notably, Cybertron requested and obtained a declaratory judgment from the Federal Bankruptcy Court, holding Capps' obligations and liability under the RCA were not discharged as a result of his bankruptcy filing. See *In re Capps*, No. 16-10141, 2018 WL 3635708, at *1 (Bankr. D. Kan. 2018). Cybertron also admitted at oral argument it was able to repurchase, through bankruptcy proceedings, the shares of stock it provided to Capps when it purchased ITK. In short, Cybertron was able to prevent any additional harm through further delay by taking its own securities off the table as a potential source of funds to satisfy the judgment here, or as a transferrable asset or liability to or from any third party to whom Capps might be indebted as a result of other legal matters. We find this action in the bankruptcy proceedings by Cybertron was not an attempt to collect on its judgment but one to protect its judgment. See *Uhlmann*, 48 Kan. App. 2d at 17-18.

While Cybertron may have hoped to further protect itself by issuing garnishment orders to leverage Capps into posting an appeal bond, the parties agree Capps did not do so. When Cybertron then proceeded to collect on the judgment through multiple garnishments, it crossed the line from *protecting* its judgment to *availing* itself of the benefits of the judgment. See *McDaniel*, 235 Kan. at 103; *Uhlmann*, 48 Kan. App. 2d at 17-18. The only conceivable protective measure served by Cybertron's decision to collect

13

on the judgment through garnishments was to prevent bankruptcy creditors in a separate proceeding from exhausting Capps' assets before Cybertron could collect as a judgment creditor in this case. However, Cybertron has failed to argue the point, and, therefore, waived and abandoned any such claim. See *In re Marriage of Williams*, 307 Kan. 960, 977, 417 P.3d 1033 (2018). In very plain terms, Cybertron voluntarily obtained garnishments on Capps' assets to collect its judgment as it now exists.

When we "consider acquiescence for what it is—an implied waiver of rights[,]" *Uhlmann*, 48 Kan. App. 2d at 17, Cybertron has waived its right to cross-appeal based on its multiple collection activities on the judgment through garnishment. Accordingly, we must dismiss Cybertron's cross-appeal. See *Alliance Mortgage Co.*, 281 Kan. at 1271.

*Capps has not waived his right to appeal.*

Capps has not waived his right to appeal by failing to stay execution on the judgment. A party may acquiesce to a judgment by making payments and, therefore, accepting the burdens of the judgment. See *Harsch v. Miller*, 288 Kan. 280, 292, 200 P.3d 467 (2009). But the test for acquiescence is whether the party acted voluntarily. *Varner v. Gulf Ins. Co.*, 254 Kan. 492, 497, 866 P.2d 1044 (1994); *Security Bank of Kansas City*, 55 Kan. App. 2d at 300. Here, although Capps did not post an appeal bond, he did not act voluntarily insofar as Cybertron successfully garnished his wages. It was by Cybertron's initiative—despite its claim on cross-appeal the district court's judgment was incorrect—that Capps' wages were garnished. Capps did not act voluntarily; rather, a third party—Capps' employer—withheld a portion of his wages pursuant to a garnishment order obtained by Cybertron. This does not show Capps intended to waive his legal rights. See *Varner*, 254 Kan. at 497; *Uhlmann*, 48 Kan. App. 2d at 17-18. Capps' appeal is properly before us, and we will address his arguments on the merits.

14

*The liquidated damages clause is valid and liquidated damages were appropriate given the nature of the claims at issue.*

Capps argues the liquidated damages clause is an invalid penalty provision; therefore, the entire judgment must be reversed. Alternatively, Capps argues the liquidated damages provision cannot validly apply to any of the alleged violations other than his acceptance of employment at CTS because Cybertron's damages for the other 10 violations were easily calculable and no evidence was presented showing Cybertron suffered any actual loss as a result thereof.

Liquidated damages provisions in contracts are permissible; penalty provisions are not. "The distinction between a contractual penalty and a provision for liquidated damages is that a penalty, in effect, is a security for performance, while a provision for liquidated damages requires a sum certain to be paid in lieu of performance. [Citation omitted.]" *Carrothers Constr. Co. v. City of South Hutchinson*, 288 Kan. 743, 754-55, 207 P.3d 231 (2009). A liquidated damages provision is valid "(1) if the amount is reasonable in view of the value of the subject matter and of the probable and presumptive loss in case of breach, and (2) if the amount of actual damages in case of breach would not be easily and readily determinable." *White Lakes Shopping Center, Inc. v. Jefferson Standard Life Insurance Co.*, 208 Kan. 121, 127-28, 490 P.2d 609 (1971).

Our Supreme Court has long held liquidated damages provisions are invalid and amount to an unlawful penalty provision where a "fixed . . . sum . . . cover[s] all or any damages which might result from a breach of the contract." *Condon v. Kemper*, 47 Kan. 126, 135-36, 27 P. 829 (1891); see *Kansas City v. Industrial Gas Co.*, 138 Kan. 755, 762-63, 28 P.2d 968 (1934) ("'Contracts are frequently made in which performances of very different degrees of importance and value are promised and one large sum of money is made payable as damages for any breach whatever. Since such a contract promises the same reparation for the breach of a trivial or comparatively unimportant stipulation as for

15

the breach of the most important one or of the whole contract, it is obvious that the parties have not adhered to the rule of just compensation. In this matter neither the intention of the parties nor their expression of intention is the governing consideration. The payment promised may be a penalty, though described expressly as liquidated damages, and vice versa.'") (quoting Restatement of Contracts § 339 [1], comment b); see also *Heatwole v. Gorrell*, 35 Kan. 692, 696, 12 P. 135 (1886) ("[W]here an absolute sum is fixed in a contract as a security against all breach or breaches of the contract, without reference to the magnitude of the breaches or the number thereof, and without reference to the amount of the actual damages which might ensue from such breach or breaches, whether great or small, and . . . where there might be several breaches, . . . each of a greater or less magnitude, and each followed by greater or less damages, such fixed sum cannot be considered . . . liquidated damages, but must be considered as a penalty.").

But, in *Carrothers*, our Supreme Court expressly rejected a retrospective comparison of liquidated damages with actual damages to determine whether the amount is reasonable. Under *Carrothers*, we can only engage in a prospective analysis as of the time of contract formation to determine (1) whether the actual damages for the breaches specified in the contract would be easily calculable, and (2) whether the liquidated damages figure is reasonable in relation to the harm(s) contemplated by the breaches. 288 Kan. at 754-55. Comparing actual damages after the fact frustrates the very purpose of the clause by robbing the parties of the benefit of agreeing to liquidated damages. 288 Kan. at 758.

Here, Cybertron estimated liquidated damages based on the average cost of losing one customer. Cybertron's CFO, Shadi Marcos, testified his liquidated damages calculation was based on the standard 36-month service term for the typical Cybertron customer, which, on average, has 10 IT service users. Cybertron typically charges its customers $100 per month per user. Over the course of the service agreement, the typical Cybertron customer would also have between $15,000 to $17,000 in computer and

equipment replacement costs. Therefore, expected revenues for Cybertron's existing customers could be up to $53,000 over the life of the service agreement, which Marcos rounded down to $50,000. Marcos further testified his liquidated damages calculation was also based on the average revenue Cybertron expected to receive from the 35 new customer contracts it acquired from ITK, which ITK told Cybertron was $50,000 every month. Based on that figure, Marcos estimated each new customer would provide Cybertron on average between $1,400 to $1,500 per month in revenue. Multiplying that figure over the 36-month service term, Marcos estimated the loss of a former ITK customer would also cost Cybertron approximately $50,000.

Capps argues Cybertron's liquidated damages estimate is problematic because it was based on a singular possibility—Capps' breach of the RCA causing Cybertron to lose a customer. But Marcos testified he also considered the possibility that certain violations of the nondisclosure provision, such as sharing Cybertron's client list, could result in the loss of more than one client. Marcos also considered the possibility that Cybertron's actual damages could differ depending on the remaining length of any given customer's service agreement. Still, these considerations relate to losing one or more clients.

Marcos further admitted he made no attempt to determine the likely damages, if any, in the event Capps provided a competitor with informal advice about business finance, LLC formation, pricing models, or other business management issues. Nor did Marcos consider the likely damages, if any, in the event Capps referred a competitor to Reflexion for email spam-filtering services; Cox for cable, internet, and/or telephone service; or a banker for obtaining a business bank account. Marcos admittedly did not analyze every possible type of violation that could occur under the RCA because "[t]here [were] too many different possibilities."

Still, we are unpersuaded by Capps' argument the liquidated damages provision is invalid. He focuses on the specifics of Cybertron's allegations rather than the nature of

17

the conduct evidenced by those violations of the RCA. In doing so, he largely asks this court to retrospectively compare Cybertron's actual damages from the breaches specifically alleged to the liquidated damages figure, which we cannot do. See *Carrothers*, 288 Kan. at 758.

We acknowledge the noncompete, nondisclosure, and nonsolicitation clauses of the RCA relate to a wide range of conduct, some of which ultimately *might not* actually cause Cybertron to lose a customer—the basis for the liquidated damages figure. For example, Capps points out the liquidated damages clause makes no distinction between the successful solicitation of a customer and the unsuccessful solicitation of a customer. But this is irrelevant to whether the clause is valid. Viewed prospectively, the solicitation of one of Cybertron's customers *could* reasonably result in the loss of a customer.

The nonsolicitation provision also prohibited Capps from contacting any vendor or services provider used by Cybertron "for the purpose of competitive business solicitation." Courts presume corporate actors make decisions on behalf of a corporation with the corporation's best interests in mind. *Kansas Heart Hospital v. Idbeis*, 286 Kan. 183, 209, 184 P.3d 866 (2008). Where Cybertron relied on or contracted with certain vendors for software, hardware, communications services, etc., it did so with the corporation's best interests in mind. In other words, Cybertron would not have done business with those vendors or service providers if it did not believe they offered Cybertron a competitive advantage. Naturally, the importance of the nonsolicitation provision's prohibition on Capps contacting those same vendors and providers *for business purposes* was to prevent one of Cybertron's competitors from gaining the same competitive business advantage as Cybertron, thus protecting against the loss of one or more customers.

Here, for example, Cybertron alleged Capps violated the nonsolicitation provision by referring Davis to Reflexion for email security and/or spam-filtering service.

Contacting a specific vendor such as Reflexion could have given Davis a competitive advantage insofar as Reflexion may have had proprietary software capable of providing a distinct competitive advantage. There could be any number of other vendors offering similar services of varying quality and price. Because Davis ran a competing business, any such competitive advantage he might gain due to the quality and/or pricing of a particular vendor's products or services could potentially lead to Cybertron losing a customer. But it would be extremely difficult to determine to what extent using such products or services could or would have improved Davis' business; thus, Cybertron's actual damages would be difficult to calculate. Viewed prospectively, Capps referring Davis to a specific vendor—here, Reflexion—reasonably falls within the scope of the liquidated damages provision. See *Carrothers*, 288 Kan. at 754-55.

Further, by referring Davis to certain service providers—here, Reflexion, Cox, and Fidelity Bank—Capps was helping a competing business in violation of the noncompete provision. Just because the *degree* of assistance may not rise to the level of causing Cybertron to lose a customer does not mean the *act* of assisting a competitor, viewed prospectively, would not reasonably be likely to cause such a result. Comparing the extent to which any given act *actually* assisted a competitor is akin to impermissibly comparing liquidated damages with actual damages. See *Carrothers*, 288 Kan. at 758.

By helping Davis, Capps positioned one of Cybertron's competitors to succeed in taking away Cybertron's customers, because any successful business will compete for the greatest market share of customers seeking the types of products and services it offers. Here, Davis' business offered substantially the same types of products and services to the same types of customers as Cybertron within relatively the same geographical market. However slight Cybertron's *actual* damages may have been is irrelevant. These were actions taken by Capps to aid the owner of one of Cybertron's competitors. From the parties' perspective as of the time of contract formation, such actions could reasonably have been seen as likely to cause Cybertron to lose one or more customers.

Here, the loss of a customer was the likely harm to result from a breach of the noncompete, nondisclosure, and nonsolicitation provisions. Soliciting a customer would naturally mean Capps (or anyone on whose behalf he made the solicitation) stood to directly take away a customer from Cybertron. Similarly, if Capps violated the noncompete agreement, it was also reasonably likely Cybertron could lose one or more customers. Capps had been employed by Cybertron; therefore, he knew, or very likely would have known, among other things: (1) The identity of Cybertron's customers; (2) Cybertron's service, pricing, and business models; and (3) the types of products and services Cybertron provided to its various customers and their individual business needs. Armed with this information, Capps could easily enable a competitor to take away one or more of Cybertron's customers.

A violation of the nondisclosure provision could also reasonably cause Cybertron to lose one or more customers by revealing any of the following: Cybertron's customer lists; Cybertron's product and service pricing information; Cybertron's financial information; the vendors Cybertron used; and what Cybertron paid its vendors for their products and services. Simply put, Capps was privy to a wealth of proprietary information that, if disclosed, could allow a competitor to undercut Cybertron and take away one or more of its customers.

The liquidated damages amount was appropriately calculated to reflect the average cost of the loss of a Cybertron customer. But Cybertron's actual damages for any given breach would not have been easily calculable because the value of the loss of one customer could vary depending on how many IT users the customer had and what point they were at in the life of their service contract with Cybertron. Also, a single violation of the noncompete and/or nondisclosure provisions could cause the loss of multiple customers. Here, the liquidated damages clause was appropriate in its scope and application viewed prospectively from the time of contract formation, and the liquidated damages amount was reasonable in proportion to the contemplated harm upon which it

20

was based. See *Carrothers*, 288 Kan. at 754-55. The parties' agreement to liquidated damages for violations of the RCA was proper, and the clause is valid on its face.

As to Capps' alternative argument, we find the point underdeveloped and unpersuasive. He asserts actual damages were easily calculable for every violation other than his acceptance of employment at CTS; therefore, the parties could not agree to liquidate those damages. See *White Lakes Shopping Center, Inc.*, 208 Kan. at 127-28. But the only breaches that would have been readily determinable were Capps' unsuccessful solicitations of Envision, Exhibit Arts, and ABS. Yet, as we have already held, the success of Capps' solicitation of Cybertron's customers is irrelevant to the enforceability of the nonsolicitation clause. The relevant contract provisions at issue were properly bargained for and binding on the parties. Capps cannot disavow liability for his breaches and the potential harm to Cybertron just because he failed to cause *actual* harm.

Cybertron's damages for any business advice Capps gave to Davis, as well as referring Davis to Reflexion, Cox, and Fidelity Bank, would be difficult to measure. It would be very difficult to determine to what extent, if any, each of those acts enabled Davis to grow his business and compete with Cybertron, and whether by doing so, how many customers, if any, Cybertron lost as a result. The liquidated damages clause is not inappropriate as applied to those breaches. See *Carrothers*, 288 Kan. at 754-55.

Finally, in the interest of thoroughness, we note one point of concern with the district court's ruling. The district court found Cybertron did not meet its burden of proof to establish a breach under Counts 1 through 8 individually, but nevertheless aggregated those alleged violations into a single judgment for $50,000. This appears inconsistent with the plain language of the RCA, which provides for liquidated damages for "any breach of the covenants." Effectively, the district court held Capps' actions constituted a single course of conduct in violation of the noncompete provision. But in doing so, the district court essentially rewrote the parties' contract and/or constructively amended

21

Cybertron's claims by collectively granting a single liquidated damages award for multiple breaches.

However, we have dismissed Cybertron's cross-appeal; thus, its argument on this point is not properly before us. We also find nothing in Capps' briefing fairly challenging the district court's action on this point, and Capps seems to admit the violation of Count 8—contact with Envision—on its own is sufficient to support the aggregated liquidated damages amount for the alleged breaches under Counts 1 through 8. An issue not briefed is deemed waived or abandoned. *State v. Arnett*, 307 Kan. 648, 650, 413 P.3d 787 (2018). At best, the point is incidentally raised but not argued. But a point raised incidentally in a brief and not argued therein is also deemed abandoned. *Russell v. May*, 306 Kan. 1058, 1089, 400 P.3d 647 (2017). And issues not adequately briefed are deemed waived or abandoned. *In re Marriage of Williams*, 307 Kan. at 977. Based on Capps' failure to properly address this point, we affirm the district court's full award of $200,000 plus costs, attorney fees, and postjudgment interest to Cybertron.

Affirmed in part and dismissed in part.